**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

MARTEZE D. HAMMONDS,

Plaintiff,

v.

PURDUE UNIVERSITY BOARD OF TRUSTEES,

Defendant.

CASE NO. 1:25-CV-41-HAB

**OPINION AND ORDER**

Plaintiff MarTeze Hammonds ("Hammonds"), an African American man, is suing the Defendant Board of Trustees of Purdue University ("Purdue") for race discrimination and retaliation under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964.

Hammonds alleges that when Purdue disciplined him for violating its anti-harassment policy, it discriminated against him by sanctioning him more harshly than similarly situated employees of different races. He also asserts that he complained of discrimination and filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") while appealing his original discipline, and Purdue retaliated against him by increasing his sanctions on appeal.

Purdue now moves for summary judgment, arguing that Hammonds has developed no facts that could support his legal claims. (ECF 45). That motion is fully briefed and ripe for ruling. (ECF 46, 51, 54). Because Hammonds does not bring his § 1981 claim through the right vehicle, fails to make a prima facie showing of discrimination or establish pretext, and provides no facts to support a causal connection between his protected activity and his sanctions, Purdue's motion will be GRANTED.

## BACKGROUND

### I. Hammonds's Employment

Hammonds worked at Purdue Fort Wayne ("PFW") for nearly five years as its Chief Diversity Officer. (ECF 47, ¶ 14). This was one of only six cabinet-level roles at PFW, and Hammonds reported directly to PFW Chancellor Ronald Elsenbaumer ("Chancellor Elsenbaumer"). (*Id.* ¶¶ 14, 17). Hammonds was PFW's only African American senior executive. (ECF 52, ¶ 126). While he worked there, Hammonds had more than a dozen employees reporting to him, including between 3 and 7 direct reports at various times during his tenure. (ECF 47, ¶ 15).

Hammonds's job duties included helping Purdue promote and meet its outcomes in diversity, equity, and inclusion. (*Id.* ¶ 19). They also included hearing and identifying issues related to diversity, equity, and inclusion, and reporting those concerns to the appropriate individuals across the university. (*Id.*).

Purdue terminated Hammonds's employment in July 2025, ten months after he filed this lawsuit. (ECF 1; ECF 47, ¶ 20).[1]

### II. Complaint and Investigation

In December 2023, Hammonds's Executive Assistant Jayla Heller ("Heller") filed a formal complaint against him. (ECF 47, ¶ 21). The complaint accused Hammonds of harassment and discrimination, most notably alleging that he denied her request to work remotely one day per week and delayed approvals for time off. (*Id.*).

---

[1] The parties dispute the reason for his dismissal, with Hammonds insisting his termination was related to his race and him engaging in protected activity. (ECF 47, ¶ 20; ECF 52, ¶ 20; ECF 52-17, ¶ 12). But Hammonds's termination is not at issue in his lawsuit. His complaint long predated the termination, (ECF 1), and he never amended his complaint to include allegations related to his firing. While "district courts retain discretion to interpret new factual allegations or claims presented in a plaintiff's briefs as a constructive motion to amend," it is "rarely appropriate to do so." *Schmees v. HC1.COM, Inc.*, 77 F.4th 483, 488–90 (7th Cir. 2023). This is not one of those rare cases, so the Court does not consider Hammonds's termination to be part of his claims.

Chancellor Elsenbaumer is usually the decision maker when someone files these types of formal complaints against PFW faculty or staff. (*Id.* ¶ 8). But because Hammonds was a direct report, Chancellor Elsenbaumer delegated his authority to Christina Wright, then the Director of the Office of Institutional Equity at Purdue's West Lafayette campus. (*Id.* ¶¶ 22–24). This gave Wright the authority to investigate the complaint, make an initial determination, and impose sanctions. (*Id.*).

Wright appointed two investigators from her office to look into Heller's complaint. (*Id.* ¶ 25). They interviewed twelve witnesses, including Heller and Hammonds. (*Id.* ¶ 27). They also reviewed Heller's complaint and attachments, Hammonds's response to the complaint, several emails, 34 pages of exhibits that Hammonds provided, and other documents. (*Id.* ¶ 28).

The investigators issued a report on February 12, 2024. (*Id.* ¶ 29; ECF 48-3, at 7–54). In it, they found that Heller's allegations were substantiated and recommended a finding that Hammonds violated Purdue's anti-discrimination and anti-harassment policies. (*Id.*). Hammonds had access to this report and most of the information the investigators gathered. (ECF 47, ¶ 30).

On February 22, report in hand, Wright convened a panel of three members from Purdue's Advisory Committee on Equity. (*Id.* ¶ 31; ECF 48-3, at 56). The panel met separately with Hammonds and Heller to ask questions and gather additional information. (*Id.*). Hammonds provided his own evidence to the panel at his meeting. (*Id.* ¶ 32). As part of her process, Wright also considered the credibility of each of the witnesses. (ECF 47, ¶ 38). The panel reconvened on March 7 to meet with the investigators and further probe the matter. (ECF 48-3, at 56). After that meeting concluded, Wright emailed Purdue's Vice President for Ethics and Compliance Alysa Rollock ("Rollock"), an African American woman. (ECF 52-18; ECF 47, ¶ 46). Wright confirmed she would find a policy violation and asked Rollock to confirm she was supposed to make the

decision without consulting anyone else. (ECF 52-18). Rollock confirmed Wright was correct. (*Id.*).

By this point, Hammonds had already raised the issue of discrimination. He spoke with PFW Title IX Coordinator Christine Marcuccilli ("Marcuccilli") sometime around when the panel convened and mentioned how he felt the process had been unfair and discriminatory. (ECF 52-2, at 41, 63:4–25).

Hammonds had also complained to Rollock about discrimination at PFW before March 2024. (ECF 52, ¶ 131). He was not the first person to raise this issue with Rollock. (*Id.* ¶ 138). Rollock recalled that Hammonds expressed concerns that African Americans were being treated unfairly and the campus administration was not being responsive. (*Id.* ¶ 137). Chancellor Elsenbaumer was also a part of those conversations. (*Id.* ¶ 139). He too recalled Hammonds raising general concerns about the campus, not complaining of discrimination against him personally. (*Id.*). These conversations occurred roughly a year or two before Hammonds received discipline. (ECF 52-2, at 43–44).

## III. <u>Sanctions</u>

### A. <u>Original Sanctions</u>

Purdue maintains both an anti-harassment and an anti-discrimination policy for its employees. Pursuant to that policy, if a violation is determined to have occurred, sanctions are decided on a case-by-case basis. (ECF 47, ¶ 6). Sanctions can include, but are not limited to:

- A letter of reprimand
- Suspension or leave of absence without pay
- Reassignment of teaching or other responsibilities
- Removal of graduate faculty certification
- Denial of a merit pay
- Demotion
- Probation
- Termination

(*Id.*).

After the panel meetings, Wright issued a determination letter with her findings on March 22. (*Id.* ¶ 33; ECF 48-3, at 56–63). Wright concluded that Hammonds had not violated Purdue's anti-discrimination policy, but had violated its anti-harassment policy. (ECF 47, ¶ 34–35).

Wright reached this conclusion based on two findings. First, she found that Hammonds revoked Heller's preexisting remote workday privileges because he became frustrated with the time she missed between protected Family and Medical Leave Act ("FMLA") leave and subsequent time off requests. (*Id.* ¶ 36). Second, she determined that Hammonds was slower to approve or deny leave requests for Heller than other employees he supervised. (*Id.* ¶ 37).

Based on her finding of a violation, Wright imposed a training sanction on Hammonds. (*Id.* ¶ 39). It required Hammonds, at his own expense, to complete approved training on effective supervisory practices and protected leave. (*Id.*). Wright told Hammonds to identify the training himself and have Chancellor Elsenbaumer or Marcuccilli approve it in advance. (*Id.*). Because Heller no longer worked for Hammonds at this point, Wright believed this sanction was proportionate to the violation and tailored toward reducing the risk of future issues. (*Id.* ¶ 40). Wright had imposed similar sanctions on several other occasions, including against white employees. (*Id.* ¶¶ 43–44).[2] Chancellor Elsenbaumer was copied on the determination letter, but did not review the evidence because he was not a part of the decision-making process. (ECF 52, ¶ 160).

[2] Although Hammonds disputes this, (ECF 52, ¶ 43), the Court concludes the dispute is immaterial. Hammonds notes that Wright could not recall whether the white faculty member she sanctioned was ordered to complete a training or a mentorship. (ECF 52-5, at 17, 60:10–61:21). Whether one calls it a mentorship program or a training program, Wright testified that she ordered the faculty member to identify it and complete it at his own expense in response to a harassment complaint. (*Id.*)

On March 27, after Wright imposed the original sanctions but before any appeal was filed, Hammonds sent proposed training sessions to Chancellor Elsenbaumer and Marcuccilli for approval. (ECF 47, ¶ 87). Chancellor Elsenbaumer held off on approval, saying he would make a recommendation at the appropriate time with Marcuccilli's input. (*Id.* ¶¶ 87–88; ECF 52, ¶ 87).

**B. <u>Appeal</u>**

Both Hammonds and Heller appealed Wright's determination, with Heller wanting more severe sanctions. (ECF 47, ¶¶ 46–49). Hammonds's eight-page appeal attempted to provide context for the documents and communications reviewed during the initial investigation. (*Id.* ¶ 50; ECF 52-12). Along with his pleas to reconsider the conclusions reached based on the facts, Hammonds also noted that he would be "remiss, as PFW's Chief Diversity Officer, if he did not point out the perception of the investigation." (ECF 52-12, at 8). He and Heller submitted their appeals to Rollock, who reviewed each party's appeal, their respective responses to each other's appeal, the formal complaint, Hammonds's response to the complaint, the investigation report, and Wright's determination letter. (*Id.* ¶¶ 46, 54).

On April 22, Rollock issued a letter upholding Wright's determination and increasing Hammonds's sanctions. (*Id.* ¶¶ 55, 57). In her letter, Rollock explained that she increased the sanctions because of the seriousness of Hammonds's misconduct, the effect of his conduct on Heller's work environment, and Hammonds's position of leadership at Purdue. (*Id.* ¶ 58–59). She later affirmed in her deposition that she felt the original sanctions were "not sufficient." (ECF 52-7, at 21–22, 80:20–82:16).

Rollock modified Hammonds's training sanction to include a ten hour requirement. (ECF 47, ¶ 60). She also provided set deadlines for Hammonds to identify, obtain approval, and complete the training. (*Id.*). Additionally, Rollock made Hammonds ineligible for a merit pay increase in

the upcoming fiscal year and ordered that Chancellor Elsenbaumer issue a formal letter of reprimand. (*Id.* ¶ 61). This is not the only time Rollock has increased sanctions on appeal, assigned an hours requirement, or removed a merit increase. (*Id.* ¶¶ 63–65). Rollock's determination on appeal was final. (*Id.* ¶ 67).

Two days after Rollock issued her letter, Hammonds presented a reorganization plan that would have eliminated the position of an employee who was a witness to the investigation. (*Id.* ¶ 79). Human Resources advised Chancellor Elsenbaumer that such a position elimination could be problematic. (*Id.* ¶ 80).

## IV. Hammonds's Complaints and EEOC Charge

Once Rollock ruled on the appeals, Chancellor Elsenbaumer sought help from Marcuccilli in identifying appropriate training for Hammonds. (ECF 47, ¶ 89). Marcuccilli and a local Fort Wayne law firm helped curate an individualized course that would satisfy his sanction. (*Id.* ¶ 90). Chancellor Elsenbaumer presented this training option to Hammonds on May 1, the deadline that Rollock imposed for him to have an identified and approved training option. (*Id.* ¶¶ 91-92).

On May 17, Hammonds filed an EEOC charge. (ECF 52-9). He claimed Purdue disciplined him differently because of his race when Rollock increased his sanctions on April 22. (*Id.*). Hammonds also asserted that the sanctions increase occurred in retaliation for him complaining of race discrimination at his panel hearing. (*Id.*). He also alleged that retaliation was ongoing through Purdue's denial of his choice of training. (*Id.*).

Hammonds also filed an Alternative Dispute Resolution Grievance over the training on the same day. (ECF 47, ¶ 93; ECF 52-15). He objected to the law firm's approved training as being severe, unfair, and costly. (ECF 48-1, at 245–46). Hammonds asked that the law firm training be reversed, that he not have to pay for five in-person trainings at the law firm, and that he be

permitted to choose existing in-house training. (*Id.*, at 246). He also requested an extended deadline to find new approved training, arguing that delayed response on approval from his March submissions did not give him enough time. (*Id.*).

Hammonds sent an email to Chancellor Elsenbaumer that detailed his grievance further. (*Id.*, at 247–49; ECF 52-15). In it, Hammonds reiterated his concerns that Purdue had failed to follow the published process for resolving complaints. (*Id.*). He also accused Purdue of discrimination and retaliation based on his belief that colleagues were allowed to take less expensive or even free training from the university to satisfy requirements of their sanctions. (*Id.*). The email made no mention of his EEOC Charge. (*Id.*). In his deposition, Hammonds acknowledged that he could not identify any employee that was permitted to take less expensive or free university training to fulfill a sanction requirement. (ECF 47, ¶ 106). At the end of his email, Hammonds asked Chancellor Elsenbaumer to consider approving alternative training courses. (*Id.* ¶ 107).

Chancellor Elsenbaumer responded to Hammonds's email robustly. He explained why the law firm training was curated, how it covered what the sanction required, and how it was adapted to fit Hammonds's needs. (*Id.* ¶ 108). He also explained why Hammonds's proposals were insufficient, reassured Hammonds that the training requirement was not discriminatory or retaliatory, and offered him another chance to propose alternative programs. (*Id.* ¶ 109–111). In the end, Hammonds did not use the law firm; instead, he completed approved training through a separate source that Marcuccilli suggested. (*Id.* ¶¶ 113–16).

## V. <u>Letter of Reprimand</u>

Pursuant to Rollock's sanctions, Chancellor Elsenbaumer issued Hammonds a formal letter of reprimand. (*Id.* ¶ 67). Before issuing the letter, Chancellor Elsenbaumer reviewed both Wright's

initial determination letter and Rollock's appeal determination letter. (*Id.* ¶ 70). He asked Marcuccilli and Tina Grady to prepare a draft. (ECF 52, ¶ 167). Marcuccilli wrote the first draft of the letter and sent it to Chancellor Elsenbaumer on May 24, after it had been reviewed by several other departments. (ECF 47, ¶ 68; ECF 52-19). Chancellor Elsenbaumer then edited and finalized the letter. (ECF 47, ¶ 68).

In the letter, issued on May 27, Chancellor Elsenbaumer suspended Hammonds's university-sponsored executive coaching sessions to allow him to focus on the training. (ECF 47, ¶¶ 67, 71).[3] He also imposed a twelve-month moratorium on Hammonds's ability to make any organizational changes within his reporting unit. (*Id.* ¶ 75). Chancellor Elsenbaumer described the moratorium as being inspired both by a desire to maintain the status quo and to ensure he learned from his training. (*Id.* ¶¶ 77, 81). He later testified in his deposition that he was also concerned about Hammonds's proposal to eliminate the position of a witness. (*Id.* ¶ 76). Both the executive coaching suspension and moratorium were included in the first draft written by Marcuccilli. (ECF 52-19; ECF 52, ¶ 173). Hammonds was the only member of Chancellor Elsenbaumer's cabinet who had received executive coaching. (ECF 47, ¶ 72). The sessions began in November 2023 after Chancellor Elsenbaumer selected Hammonds for an opening that Purdue's West Lafayette campus made available to someone in the PFW cabinet. (*Id.* ¶¶ 72–73).

Chancellor Elsenbuamer testified in his deposition that while Marcuccilli may have been consulted on including the executive coaching suspension and the moratorium, he did not recall her being the one to make that decision. (ECF 52-3, at 13, 46:3–47:10). In a sworn declaration,

---

[3] Although Hammonds disputes the true purpose, (ECF 52, ¶ 71), this is what the letter said. (ECF 48-4, at 11–12).

Chancellor Elsenbaumer says he learned of the EEOC Charge on May 30, when he was notified by the Office of Legal Counsel. (ECF 48-4, ¶ 36).[4]

At some point around this time, Hammonds discussed his EEOC Charge with Marcuccilli. (ECF 52, ¶ 134). Hammonds's deposition testimony is unclear whether this conversation happened before or after Chancellor Elsenbaumer issued his letter of reprimand. (ECF 52-2, 123–124, 202:9–203:1). But in a sworn declaration, Marcuccilli attests that she was not aware of Hammonds's EEOC Charge when she wrote her draft of the letter. (ECF 48-11, ¶ 5). She says she did not know of the EEOC Charge until May 31. (*Id.* ¶ 6).

## LEGAL STANDARD

Summary judgment is appropriate if a moving party can demonstrate "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, evidence must be viewed in the light most favorable to the non-moving party. *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014). Put another way, a court will only grant summary judgment "if, on the evidence presented, no reasonable juror could return a verdict in [the non-moving party's] favor." *Sorensen v. WD–40 Co.*, 792 F.3d 712, 722 (7th Cir. 2015). When the non-moving party presents admissible evidence to a court that creates a genuine issue of material fact, that court must deny summary judgment. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011) (citations omitted). Courts do not supersede the jury's role in making credibility determinations and weighing the evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## DISCUSSION

[4] He had testified at his deposition that he did not know until the lawsuit was filed, but acknowledged that he refreshed his recollection of this email after the deposition ended. *Id.*

**I. <u>§ 1981 Claim</u>**

Hammonds brings his actions in this case under both Title VII and § 1981. Both claims are analyzed under the same standard. *Hobbs v. City of Chicago*, 573 F.3d 454, 460 n. 1 (7th Cir. 2009). But Purdue argues the § 1981 claim should be dismissed because Hammonds improperly pleaded it as a standalone cause of action. Hammonds did not respond to this argument. The Court agrees with Purdue.

The Seventh Circuit has held and reaffirmed that allegations of § 1981 violations against state actors can only be brought through claims under 42 U.S.C. § 1983. *Campbell v. Forest Pres. Dist. of Cook Cnty., Ill.*, 752 F.3d 665, 671 (7th Cir. 2014) ("§1983 remains the exclusive remedy for violations of §1981 committed by state actors . . . . § 1981 does not create a private right of action against state actors."); *Barnes v. Bd. of Trs. of Univ. of Ill.*, 946 F.3d 384, 389 n. 1 (7th Cir. 2020); *Taylor v. Bd. of Educ. of the City of Chicago*, No. 21-1359, 2021 WL 5985534, at *3 (7th Cir. Dec. 17, 2021). Purdue is an arm of the State of Indiana. *Kashani v. Purdue Univ.*, 813 F.2d 843, 844 (7th Cir. 1987). And Hammonds did not plead a § 1981 violation through a § 1983 claim like these precedents require. (ECF 1). Accordingly, Purdue's motion for summary judgment on Hammonds's § 1981 claim will be GRANTED.

**II. <u>Title VII Discrimination</u>**

To survive summary judgment on a Title VII discrimination claim, "a plaintiff must present evidence [that] would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the adverse employment action." *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 710 (7th Cir. 2017) (internal quotations omitted). Thus, the "sole question that matters" is whether a reasonable juror could conclude that Hammonds would

have been disciplined differently if he was a different race, and everything else remained the same. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764 (7th Cir. 2016).

There are two ways the Court may analyze Hammonds's case. First, the Court may use the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Second, as the Seventh Circuit explained in *Ortiz*, the Court may also simply ask "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff[']s race . . . caused the discharge or other adverse employment action." *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

Under *McDonnell Douglas*, Hammonds must first set forth a prima facie case of racial discrimination. 411 U.S. at 802. To do this, Hammonds must show that (1) he is a member of a protected class; (2) he performed his job to his employer's expectations; (3) he suffered an adverse employment action; and (4) one or more similarly situated individuals outside his protected class received better treatment. *Barbera*, 906 F.3d at 629. If Hammonds can make this prima facie showing, the burden then shifts to Purdue to "present a legitimate, non-discriminatory reason" for the adverse employment actions. *Id.* Finally, if Purdue carries its burden, then Hammonds must show that the reason offered by Purdue is pretextual. *Id.*

### A. ***McDonnell Douglas***

#### 1. **Prima Facie Case**

Hammonds fails to make a prima facie case under the burden-shifting *McDonnell Douglas* framework. Although he is a member of a protected class and he suffered adverse employment actions, Hammonds has not identified similarly situated individuals of a different race who received better treatment.

Employees are only similarly situated "if they are directly comparable in *all material respects*." *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006) (emphasis added). While the requirements for finding a comparator to be similarly situated are not onerous, there must be enough commonality "to allow for a meaningful comparison in order to divine whether discrimination was at play." *Barricks v. Eli Lilly & Co.*, 481 F.3d 556, 560 (7th Cir. 2007). "When uneven discipline is the basis for a claim of discrimination, the most-relevant similarities are those between the employees' alleged misconduct, performance standards, and disciplining supervisor." *Rodgers v. White*, 657 F.3d 511, 518 (7th Cir. 2011). When comparing employees alleged to have engaged in similar misconduct, "the critical question is whether they have engaged in conduct of comparable seriousness." *Coleman v. Donahoe*, 667 F.3d 835, 851 (7th Cir. 2012).

**a. <u>Comparators</u>**

Hammonds offers three comparators who Purdue investigated for violations of its anti-harassment policy, none of whom the Court finds to be valid comparators. A brief description follows:

Cidgem Gurgur ("Gurgur") was a white Purdue faculty member subject to a disciplinary matter where Chancellor Elsenbaumer served as the final decision maker. (ECF 52, ¶ 180). Gurgur was accused of extensive verbal harassment, written harassment, and disruption of the workplace environment over more than two years. (*Id.* ¶ 181).

Chancellor Elsenbaumer found that Gurgur violated university policy. (*Id.*). Although the hearing panel recommended termination, Chancellor Elsenbaumer chose not to terminate her. (*Id.* ¶ 182). He instead opted to impose a two-year suspension without pay. (*Id.* ¶ 183). Chancellor Elsenbaumer concluded this was more appropriate because although the conduct was severe and

had been ongoing for some time, it was Gurgur's first formal infraction. (*Id.*). He felt the ultimate sanction was not appropriate for a first offense. (*Id.*).

Hammonds also points to two other complaints made by a white employee, Andrew Denton ("Denton"), against non-African American employees. (*Id.* ¶¶ 184–193). Wright made the initial gatekeeping determination in one case and the final determination in the other. (*Id.* ¶¶ 187, 190).

Denton lodged his first complaint against Lieutenant Kang ("Kang"), who is Asian. (*Id.* ¶ 184). The complaint stemmed from several disagreements related to training, rules Kang implemented that Denton felt unfairly singled him out, and complaints Kang made that negatively impacted one of Denton's evaluations. (*Id.* ¶¶ 185–86). Wright recommended that the complaint not proceed past the gatekeeping stage to a full investigation because she did not believe the allegations constituted a violation of the anti-harassment policy. (*Id.* ¶ 188). She believes Erin Oliver, the decision maker in this case, adopted her recommendation. (ECF 52-5, at 15, 50:10–52:17).

Denton's second complaint accused Captain Myles ("Myles"), who is white, of flashing him and showing him his anus. (ECF 52, ¶ 189). In her deposition, Wright conceded that such conduct could violate the anti-harassment policy depending on the circumstances. (ECF 52-5, at 20, 72:23–73:21). But she said that in this case, the investigators concluded—and she agreed—that Denton's complaint was time-barred. (ECF 52, ¶ 190). At Purdue, such complaints must be filed within 120 days of the incident. (ECF 52-5, at 12, 40:22–41:7). Wright concluded that upon investigation of the allegations against Myles, the alleged incidents happened far outside that timeframe. (*Id.*, at 20, 70:16–71:5). As such, Wright dismissed Denton's complaint. (ECF 47, ¶ 190).

**b. <u>The Comparators Are Not Similarly Situated</u>**

Beginning with Gurgur, Hammonds argues that she received more favorable treatment because Elsenbaumer reduced her sanctions from the panel's recommendation while Hammonds received continually escalating sanctions. The Court disagrees.

Gurgur was suspended without pay for two full years. Hammonds incurred training obligations, loss of a pay increase for one year, a temporary alteration of some job privileges and responsibilities, and a letter of reprimand. A multi-year unpaid suspension is significantly more severe than the sanctions imposed on Hammonds. While Elsenbaumer spared Gurgur from being fired—the highest possible sanction—that does not mean she was treated more favorably than Hammonds. *See Lucas v. Chicago Transit Auth.*, 367 F.3d 714, 728 (7th Cir. 2004) ("[T]he plaintiff must establish that he received dissimilar—and more harsh—punishment than that received by a similarly situated employee who was outside the protected class."); *Martin v. Cook Cnty.*, No. 17 C 2330, 2019 WL 3733690, at *8 (N.D. Ill. Aug. 8, 2019) (noting in a retaliation case that the plaintiff's supervisor receiving a longer suspension for similar conduct undercut her claim that she was singled out for discipline).

In fact, Gurgur and Hammonds are not comparable on nearly any level. Gurgur was a faculty member while Hammonds was a cabinet-level senior executive. Gurgur engaged in pervasive misconduct over a period of several years while Hammonds's misconduct was an isolated event. They had different final decision makers in their disciplinary proceedings: Elsenbaumer for Gurgur and Wright for Hammonds. *See Moreland v. Nielsen*, 900 F.3d 504, 507-508 (7th Cir. 2018) (holding employees were not similarly situated where the decisions were made by different decision makers). In sum, Gurgur engaged in more serious misconduct, received more serious punishment, received discipline from a different decision maker, and was not subject to the heightened standard Hammonds was held to as a high-ranking university official. Hammonds

offers no evidence beyond his own self-supporting conjecture to suggest any differences occurred because of his race.

Kang is also a poor comparator. Hammonds argues that Kang received more favorable treatment from Wright because he received no discipline despite allegations of repeated misconduct over more than a year. Wright recommended no investigation against Kang because she concluded Denton's allegations, if true, did not rise to the level of harassment. Although the outcome for Kang proved more favorable, he did not engage in conduct of comparable seriousness to Hammonds. Denton generally alleged that Kang treated him unfairly and implemented rules that singled him out. But Denton never alleged that Kang retaliated against him for taking protected leave, or for engaging in any kind of protected activity. Unfair treatment and retaliation for legally protected activity are not one and the same. Kang was also not a cabinet-level official, so he would not have been subject to the same standard as Hammonds. Plus, despite Hammonds's characterization, Wright was not the final decision maker.

Finally, Myles too fails as a comparator. Hammonds contends that Myles received no discipline despite being accused of more severe misconduct. Denton's allegation against Myles was unquestionably more serious. He accused Myles of exposing himself inappropriately. Wright, who was the final decision maker, said in her deposition that such an allegation could violate Purdue's anti-harassment policy, and confirmed that she dismissed the complaint. Hammonds correctly notes that Myles's outcome was more favorable than his, despite arguably worse alleged misconduct. But that is not enough.

Wright dismissed Denton's complaint against Myles due to its untimeliness. Purdue policy requires complaints be filed within 120 days of alleged incidents. Wright testified that an investigation was launched into Myles, and that investigation revealed the allegations were

"significantly outside the time period." While the facts may suggest that an employee outside the protected class received more favorable treatment, there is nothing to suggest the treatment was based upon race. It is undisputed that the claim against Myles did not proceed because of its untimeliness.

Because the Court finds none of these three Purdue employees were similarly situated to Hammonds, he has not met his burden as to the prima facie discrimination case.

### 2. Legitimate, Non-Discriminatory Reason and Pretext

But even if Hammonds could make a prima facie discrimination case, Purdue offers legitimate, non-discriminatory reasons for its disciplinary decisions and Hammonds fails to show those reasons were pretextual.

Pretext "means a lie, specifically a phony reason for some action." *Smith v. Chi. Transit Auth.*, 806 F.3d 900, 905 (7th Cir. 2015). A plaintiff "must demonstrate pretext by a preponderance of the evidence." *Brooks v. Avancez*, 39 F.4th 424, 435 (7th Cir. 2022). If an employer "honestly believed its reasons for taking the challenged actions, even if those reasons were incorrect, then the reasons were not pretextual." *See v. Ill. Gaming Bd.*, 29 F.4th 363, 368 (7th Cir. 2022). In other words, "the only question is whether the employer honestly believed it had a non-discriminatory reason" for the adverse action. *Brooks,* 39 F.4th at 436.

Purdue offers legitimate, non-discriminatory reasons for each sanction imposed on Hammonds. Wright stated that the training sanction was appropriate for Hammonds's violation and targeted to reduce future issues. Rollock testified in her deposition that she increased the sanctions because she concluded Wright's were insufficient and harsher sanctions were more appropriate. This justification came after her letter ruling on the appeal, where she noted that she imposed the new sanctions after considering the seriousness of Hammonds's misconduct, the

effect of his misconduct on Heller's work environment, and Hammonds's senior leadership position. Chancellor Elsenbaumer also provided two explanations for the moratorium imposed in his letter of reprimand: (1) to maintain the status quo while he determined if Hammonds implemented his training, and (2) to prevent Hammonds from eliminating the role of a witness. Given these explanations, Purdue has met its burden of produced legitimate, non-discriminatory reasons for its actions.

Turning to pretext, Hammonds asserts that Rollock's and Chancellor Elsenbaumer's justifications for these increased sanctions were inconsistent, which allows for the inference of a discriminatory motive. Not so. To give rise to pretext, "explanations must actually be shifting and inconsistent." *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 881 (7th Cir. 2016) (quoting *Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 577 (7th Cir. 2003)). "Merely providing multiple, or additional, reasons for an adverse employment decision does not establish pretext." *Saud v. DePaul Univ.*, 154 F.4th 563, 569 (7th Cir. 2025), *cert. denied*, 224 L. Ed. 2d 527 (Apr. 27, 2026).

Rollock's explanation in her deposition is entirely consistent with the one she included in her ruling on the appeal. The former was merely a more general overarching summary of the latter. Chancellor Elsenbaumer's two explanations for the moratorium he imposed differ slightly, but are consistent. Maintaining the status quo implies no firings or reorganizations. Chancellor Elsenbaumer's additional concern around Hammonds's proposal to eliminate the position of a witness, which Hammonds agrees he did, does not undercut the validity of a stated desire to maintain the status quo and see whether Hammonds learned from his training. None of these several justifications are shifting or inconsistent. *See Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 577 (7th Cir. 2015) ("Where an employer relies on multiple reasons for the termination, its failure

to address *all* of the reasons in *each* communication about the employee is not enough to show contradictions or shifts in rationales that suggest pretext.”). And Hammonds provides no other evidence that indicates either a racial motive or that Purdue did not honestly believe in these reasons for the sanctions imposed. *Sand*, 154 F.4th at 567 (noting “pretext is not shown when the employer honestly believed the reason for its decision” and courts do not “question an honestly held reason” (internal quotations omitted)).

Accordingly, under *McDonnell Douglas*, Hammonds’s discrimination claim cannot withstand summary judgment.

**B. *Ortiz***

Hammonds fares no better under the “more straightforward evaluation of the evidence” called for in *Ortiz*. *Reives v. Illinois State Police*, 29 F.4th 887, 893 (7th Cir. 2022). The ultimate question is “whether the evidence would permit a reasonable factfinder to conclude that the plaintiff[’]s race . . . caused the discharge or other adverse employment action.” *David*, 846 F.3d at 224. As the Court has already explained, no evidence in the record supports an inference of racial discrimination beyond Hammonds’s own complaints, no comparator employees he identifies are similarly situated, and Purdue asserted several non-discriminatory reasons for every disciplinary action taken.

The outstanding allegations not yet addressed do not bolster Hammonds’s claims. He claims that he received harsher and more costly training sanctions than other similarly situated employees. Hammonds emailed this complaint to Chancellor Elsenbaumer the same day he filed his EEOC Charge. But Hammonds admitted in his deposition that he knew of no other employees who received more lenient or cheaper training sanctions for similar policy violations. Plus, Purdue still worked with him after the complaint and found less expensive training for him.

To the extent Hammonds's complaints throughout his disciplinary process about Purdue's failure to follow published procedures constitute discrimination allegations, those allegations would not prove discrimination even if true. *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000). His assertion that Wright showed bias through her March 7 email confirming she would find a policy violation also holds no water. By that point, the investigation was complete and the panel hearings had concluded.

All Hammonds has in the way of evidence is timing and his own conjecture. "Summary judgment is the put up or shut up time in litigation." *Brown v. CACH, LLC*, 94 F.4th 665, 667 (7th Cir. 2024) (internal quotation omitted). Hammonds's unsubstantiated speculation is no longer good enough. *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 841 (7th Cir. 2014) ("Speculation is no substitute for evidence at the summary judgment stage."). For these reasons, Purdue's motion for summary judgment on Hammonds's Title VII discrimination claim will be GRANTED.

## III. <u>Title VII Retaliation</u>

To defeat summary judgment on his retaliation claim, Hammonds must show that (1) he engaged in protected activity, (2) he suffered adverse employment actions, and (3) there was a causal connection between the protected activity and the adverse actions. *Castro*, 786 F.3d 559, 564 (7th Cir. 2015).

Adverse action must clear a higher threshold for retaliation claims than discrimination claims. "Rather than causing 'some harm,' an action in the retaliation context must be materially adverse, meaning that it causes 'significant' harm." *Est. of Harris v. City of Milwaukee*, 141 F.4th 858, 869 (7th Cir. 2025) (quoting *Muldrow v. City of St. Louis*, 601 U.S. 346, 357 (2024)). Materially adverse actions are those that might well have "dissuaded a reasonable worker from

making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006). Examples include, but are not limited to, "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Lapka v. Chertoff*, 517 F.3d 974, 986 (7th Cir. 2008) (quoting *Crady v. Liberty Nat'l Bank & Tr. Co. of Indiana,* 993 F.2d 132, 136 (7th Cir.1993)).

Causal connections can be shown by "suspicious timing, ambiguous statements, and 'other bits and pieces from which an inference of [retaliatiory] intent might be drawn;' evidence that similarly-situated employees were treated differently; and evidence that the employer's stated reason for the decision was pretext." *Harden v. Marion Cnty. Sheriff's Dep't*, 799 F.3d 857, 862 (7th Cir. 2015) (quoting *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 647 (7th Cir. 2013). This list is not exhaustive. *Id.* "Suspicious timing by itself will rarely support an inference of retaliation." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 564 (7th Cir. 2016). But it may be enough where "an adverse employment action follows on the close heels of protected expression and the plaintiff can show the person who decided to impose the adverse action knew of the protected conduct." *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005).

Here, the record cannot establish a causal connection between Hammonds's protected activity and the adverse actions taken against him. Hammonds argues that Rollock and Chancellor Elsenbaumer both increased his sanctions in retaliation for his complaints and EEOC Charge. But he fails to identify any evidence to support that assertion beyond suspicious timing, which in and of itself has problems.

Rollock's appeal determination predated Hammonds's EEOC Charge, grievance, and email to Chancellor Elsenbaumer by almost one month. So Rollock could not have retaliated

against Hammonds for those actions. Hammonds also does not contend that Rollock knew about his discrimination complaints at the panel hearing when she issued her determination.

Hammonds nonetheless argues that his conversations with Chancellor Elsenbaumer and Rollock about systemic discrimination at PFW could have led Rollock to retaliate. To the extent those conversations even constituted protected activity, they occurred roughly one year before Hammonds received discipline and several months before Heller filed the complaint which gave rise to that discipline. That time gap far exceeds what the Seventh Circuit routinely finds to be too long to prove causation without additional evidence. *See Turner v. The Saloon, Ltd.*, 595 F.3d 679, 690 (7th Cir. 2010) (two-month gap too long to withstand summary judgment on ADA retaliation claim); *Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) (seven weeks too long for Title VII retaliation claim). While Hammonds rightly notes that the passage of time does not necessarily defeat a retaliation claim, additional evidence is necessary. *Baines v. Walgreen Co.*, 863 F.3d 656, 666 (7th Cir. 2017). He also points to the comment he made in his appeal about the perception of the investigation, but that vague call to optics does not rise to an explicit accusation of discrimination that could suggest Rollock had a basis to retaliate.

Hammonds fails to prove causation for Chancellor Elsenbaumer's increased sanctions as well. Hammonds contends that several facts in the record support an inference of retaliation. These include the EEOC Charge being filed ten days before Chancellor Elsenbaumer issued his letter of reprimand, the unprecedented nature of the added sanctions, the continually increasing sanctions, Chancellor Elsenbaumer's lack of a factual basis for these sanctions, and his allegedly imputed knowledge of the EEOC Charge through Marcuccilli. None of these arguments prove persuasive.

The timing, in a vacuum, could raise suspicions. But like with Rollock, additional evidence is needed, yet lacking. Purdue concedes that Hammonds was the first person to have executive

coaching privileges suspended.[5] Yet that proves nothing because Hammonds was the only cabinet-level executive at PFW receiving executive coaching. He offers no evidence that indicates someone else ever received such coaching and then engaged in similar violations.

As for Hammonds's argument about increasing sanctions, the Court has already explained that Purdue has consistent and legitimate non-discriminatory justifications for every sanction and Hammonds has failed to establish pretext. Further, Hammonds misconstrues Chancellor Elsenbaumer's testimony about him purportedly lacking knowledge of the facts that needed to support increasing his sanctions. Although Chancellor Elsenbaumer did not review Wright's letter after her determination because he was not involved as the decision maker, he reviewed both Wright's and Rollock's letters before issuing his letter of reprimand. He thus had all the facts he would need to write the letter as he saw fit.

Hammonds has also not produced any evidence that Elsenbaumer knew of his EEOC Charge when drafting and issuing the letter of reprimand. Such knowledge is required to sustain a retaliation claim. *Culver*, 416 F.3d at 546; *see also Eaton v. J. H. Findorff & Son, Inc.*, 1 F.4th 508, 512 (7th Cir. 2021) ("In order to demonstrate that a defendant was motivated to retaliate based on the plaintiff's protected activity, the plaintiff must first produce evidence that the defendant had actual knowledge of the protected activity."). Although Hammonds filed the EEOC Charge on May 17 and Chancellor Elsenbaumer issued his letter on May 27, Chancellor Elsenbaumer attests he did not learn of the EEOC Charge until May 30. No evidence in the record says otherwise.

Hammonds still argues that he spoke with Marcuccilli about discrimination and the EEOC Charge before the letter came down, that this establishes a retaliatory motive for her, and that this can be imputed to Chancellor Elsenbaumer through a "cat's paw" theory of liability. Hammonds's

---

[5] He was not the first to have Elsenbaumer pause his ability to make organizational changes. (ECF 52, ¶ 179).

deposition testimony does not clearly indicate when this conversation with Marcuccilli happened. But his claim would not be saved even if it happened before the letter was issued.

The cat's paw theory of liability states "that it is appropriate to impute discriminatory or retaliatory animus to a decisionmaker when the party nominally responsible for a decision is, by virtue of [their] role in the company, totally dependent on another employee to supply the information on which to base that decision." *Hicks v. Forest Pres. Dist. of Cook Cnty., Ill.*, 677 F.3d 781, 790 (7th Cir. 2012) (internal quotations omitted). That employee merely "provid[ing] factual information or other input that may have affected the adverse employment action" is not enough. *Dey v. Colt Construction & Dev. Co.*, 28 F.3d 1446 (7th Cir. 1994).

Here, Hammonds has nothing beyond Marcuccilli's alleged knowledge of the EEOC Charge, which she disputes, to suggest she then had a retaliatory motive. Either way, the cat's paw theory fails because Chancellor Elsenbaumer was not "totally dependent" on Marcuccilli. He merely asked her to write a draft of the letter of reprimand. He also testified that while she was consulted on what to include in the letter and drafted it, she was not the one who made the final decision on what went and remained in it. The record only shows that Marcuccilli carried out the directives of other individuals. Hammonds provides no other evidence to suggest Marcuccilli told Chancellor Elsenbaumer about the EEOC Charge or that she wielded authority that would give her independent authority to include those sanctions in the letter. Everything Marcuccilli did was ultimately subject to Chancellor Elsenbaumer's approval, and he had several other streams of information beyond her.

Even if Hammonds could establish a causal connection, neither the executive coaching suspension nor the moratorium are adverse actions that could sustain a retaliation claim. These actions must not have only been adverse, but "materially adverse." *Est. of Harris*, 141 F.4th at

869. The executive coaching suspension cost Hammonds access to a benefit he had only received for the previous seven months of his then-four-year tenure at PFW. The moratorium constrained one aspect of his leadership role for a fixed and limited period.

Neither of these sanctions stripped him of money, core job benefits, job title, or status within PFW's hierarchy. Even with these two added sanctions, Hammonds remained Chief Diversity Officer and retained all the responsibilities, pay, and consistent benefits that job entailed in every respect aside from his ability to make organizational changes within his department for a limited time. Thus, nothing in the record supports the notion that these sanctions were materially adverse in the way both Supreme Court and Seventh Circuit precedents require. Hammonds invokes *Muldrow* to argue that he need not prove the materiality of these adverse actions. But that argument fails because it completely ignores the distinction that *Muldrow* itself drew between the levels of harm required for retaliation and discrimination claims. 601 U.S. at 357 ("The Court [previously] held [in *White*] that the [anti-retaliation] provision applies only when the retaliatory action is 'materially adverse,' meaning that it causes 'significant' harm. . . . The City thinks we should import the same standard into the anti-discrimination provision at issue. . . . But that would create a mismatch. *White* adopted the standard for reasons peculiar to the retaliation context.").

For these reasons, Hammonds's retaliation claim also fails and none of his claims survive summary judgment.

## CONCLUSION

Purdue's motion for summary judgment (ECF 45) is GRANTED.

**SO ORDERED** on September 17, 2026.

s/ *Holly A. Brady*
CHIEF JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT